[No. B198541. Second Dist., Div. Eight. Feb. 5, 2008.]

In re ANGEL L., a Person Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY
SERVICES, Plaintiff and Respondent, v.
L.L. et al., Defendants and Appellants.

**COUNSEL**

Michael A. Salazar, under appointment by the Court of Appeal, for Defendant and Appellant L.L.

Christopher Blake, under appointment by the Court of Appeal, for Defendant and Appellant Jessie L.

Raymond G. Fortner, Jr., County Counsel, James M. Owens, Assistant County Counsel, and Tracey F. Dodds, Deputy County Counsel, for Plaintiff and Respondent.

## OPINION

**FLIER, J.**—Father and mother appeal the juvenile court's April 12, 2007 order terminating parental rights in the minor, their 14-year-old daughter Angel L., and assumption of jurisdiction in this proceeding some 12 years ago. Based on events following the termination of parental rights order, respondent Los Angeles County Department of Children and Family Services concedes the minor is not adoptable and accordingly does not object to the order being reversed. However, respondent contends (1) the portion of the appeal contesting the juvenile court's subject matter jurisdiction should be dismissed for lack of an adequate record on appeal and (2) in any case, the juvenile court properly exercised emergency jurisdiction in this proceeding and continues to have jurisdiction over the minor. We reverse the order terminating parental rights and hold the juvenile court properly assumed, and it continues to properly maintain, jurisdiction over the minor.

## FACTUAL AND PROCEDURAL HISTORY

The minor, then a little over two years of age, and her three siblings, ages six, four, and five months, were detained in February 1996, when father brought them to Los Angeles for a visit with their 83-year-old paternal grandmother.

Father went on an errand, leaving the four children in the care of their grandmother, who was physically and mentally unable to care for herself. The grandmother was an outpatient at Good Samaritan Hospital. Two social workers from the hospital summoned the police when they made a routine visit to check on the grandmother and found the children in her charge.

According to the police report, the home was in a filthy and unsanitary condition that included a flea and fly infestation. The baby was crying with a saturated dirty diaper, and the older children were unfed and had defecated and urinated in their clothing. None of the children had language skills or

knew their names. The two oldest children urinated in any location and did not know how to use a bathroom. The minor had a severe diaper rash with open wounds.

Father returned to the home while the police were still present. He told the officers he believed the grandmother was an appropriate caretaker for the children, and he did not seem to understand the severity of the situation. He said he was visiting the grandmother because he had heard she was ill, but he had not realized she was senile. He was only in Los Angeles for a day to help the grandmother and see a doctor himself. He was unable to tell the police about the children's mother. The officers took the children into protective custody.

Father told the police officers he resided at an address on Sandy Via in Baker, California. He also told a social worker for respondent that he lived in the desert in Baker, California, giving the same Sandy Via address. He said there were no neighbors or telephones. Mother telephoned the social worker from her place of work, a ranch in Nevada. She identified herself but would not provide any information on the children, such as their birth dates, expressing a belief that the social worker was going to sell her children. She stated the children resided in Nevada on a ranch and were well cared for. She denied the children had any speech problem. A relative told the social worker the parents lived out of a camper in the Nevada desert and were transient.

Respondent filed a petition pursuant to Welfare and Institutions Code section 300.[1] An amended petition alleged under section 300, subdivision (b), that the children were found to be in an unsanitary and unkempt condition, including filthy clothing saturated with urine; that the minor suffered from severe diaper rash and the paternal grandmother had failed to obtain needed medical care for her; that all of the children had special or unique problems, including developmental delays; and that the parents had limited ability to deal with those problems.

The reports generated for both the detention hearing and the jurisdictional hearing showed that all four children had varying degrees of mental or social retardation and were delayed in their development.

---

[1] All further statutory references are to the Welfare and Institutions Code unless noted otherwise.

The clerk's transcript reflects that the parents were appointed counsel at the detention hearing, which took place in February 1996. At the hearing, the court found a prima facie case for detaining the children and ordered respondent to contact Nevada regarding an "Interstate Compact on the Placement of Children" (ICPC) or some arrangement "other than ICPC." (See Fam. Code, § 7900 et seq.)

For the dispositional hearing, respondent reported the social worker interviewed father telephonically. Father stated he had driven all night to Los Angeles and the children had taken bottles before they left. He left his children with his mother to go to the store for an hour. He did not see fleas at his mother's residence, and he was not planning to have the children stay overnight. He had arrived at 8:00 a.m. and planned to return to Nevada at 8:00 p.m. He said the children were clean when they left Nevada, and they must have smelled of urine because of his mother's cat. He also said the children did not answer to their names because he called them by other names.

In March 1996, at the pretrial resolution conference, the parents entered no contest pleas and the juvenile court found allegations of the amended petition to be true. The court proceeded with the disposition, declared the children dependents of the court and ordered them suitably placed. Both parents were ordered to participate in parent education and family counseling. Respondent was ordered to contact Nevada immediately for an ICPC. The court further ordered respondent to contact a Nevada judge (Judge Smith) and the mother's employer and friend (Pastor Lee).

In May 1996, respondent informed the court in a progress report that its social worker had spoken with mother, a social worker from Nevada's Division of Children and Family Services, Judge Smith and Pastor Lee. Respondent's social worker had initiated an ICPC with Nevada, referred the children to the "Regional Center" and obtained copies of their psychological and developmental evaluations. Respondent's social worker learned from the Nevada social worker that Nevada was in a state of extreme financial crisis and there was no possibility of placing the children in an existing foster care home. The Nevada worker said the ICPC would enable the Nevada department to evaluate the parents' home and help the family obtain services for the children if they were to be returned home. He advised that the Nevada agency could complete the home evaluation and licensing process if Los Angeles County could procure potential foster placements in Nevada.

The Nevada social worker indicated Sandy Valley, where the parents purportedly lived, is located partly in Clark County, Nevada, and partly in San Bernardino County, California. He stated Nevada's Division of Children and Family Services was unable to provide services in Sandy Valley and could provide only limited family preservation services in Las Vegas.

Respondent's social worker also spoke with Judge Smith, who described Sandy Valley as a rural town consisting of a grocery store, two saloons, and a restaurant. There was no physician, but a county health nurse came out every three months. Judge Smith had known the family for some time before respondent's involvement. The judge said the parents appeared to love their children as "things, cuddly bears." She did not believe they had the ability to raise their children to functional adulthood. The judge stated she had contacted a facility in Nevada to inquire about the children's placement, but the facility was not available for children with such severe disabilities.

Pastor Lee raised with respondent's social worker the possibility of finding community members who might be interested in becoming foster parents for the children.

Respondent reported to the juvenile court that mother herself had been a Regional Center client in 1986, when she was assessed as mentally retarded with an IQ of 68. Program services were terminated in 1987 at the request of mother's father.

During the succeeding years, the court held periodic review hearings and, after numerous continuances, ultimately set a contested section 366.22 hearing for September 1998. At that time, the court found that although two and a half years had passed since the children's detention, the parents had received no reunification services because they lived in Nevada and Nevada was unwilling to provide them services. The court admitted into evidence reports from respondent and father's counsel, concluding the parents had been offered but not provided services because they lived in Nevada and could not participate in services offered in California. The court found that "the people and the government agencies in Nevada would not supervise the case, would not take the children into Nevada, and would not come up with a program to assist with services." The court noted that an ICPC, though ordered, had not been possible for various reasons and the time for reunification services was extended as a result. A letter from the Nevada Child and Family Services Division in evidence reported that neither parent expressed any awareness of the "profound language deficits" displayed by their two older children, whom

the parents described as normal, "pretty smart" and "very bright." Both parents claimed their children had basic self-care and toileting skills, and they had explained away the language deficits as "shyness" or discomfort around strangers.

A psychological evaluation of the parents ordered by the juvenile court concluded it would be a high risk situation for the children to be returned to the parents due to the children's significant delays and special needs, which the parents did not seem to recognize. An addendum to the psychologist's report stated reunification would not be in the best interest of the children because the parents would need highly specialized parenting instruction "due to their low intellectual functioning and at times inappropriate social behavior." The report stated it would not be in the children's best interests to refer them back to Nevada as the services available in Nevada did not match the current services the children were receiving in California.

The court found clear and convincing evidence the children were not likely to be adopted and ordered long-term foster care for the children.

The next few years indicated renewed efforts by respondent to place the children in Nevada with the court's approval, temporary placements in Nevada in June 2000, and the eventual return of all of the children to California after those placements failed. During this period, the minor was diagnosed by one doctor as having a major depressive disorder with psychotic features and by a second doctor as having an obsessive compulsive disorder. She continued to be developmentally delayed and demonstrated escalating argumentative and confrontational social behavior.

In May 2001, the minor was returned to California and placed in a home at the request of Nevada's social services department. The other children were returned to California in February 2006, at the Nevada agency's insistence. The agency claimed the purpose of having the children placed in Nevada was to reunify the children with their parents but, consistent with their past behavior of going through lengthy periods of having no contact with their children, the parents had not participated in the plan for a long time.[2]

The court ultimately held a permanency planning hearing for the minor in April 2007. By that time, the minor had been in 19 placements since her initial detention. The court was advised that the most recent foster parent was committed to providing a permanent home for her through adoption, and respondent recommended termination of parental rights. Both parents were

---

[2] By this time, father and mother were no longer living together. Mother was unemployed and had relocated to Pahrump, Nevada.

present for the permanency planning hearing. Counsel for father stated father was not in agreement with the plan of adoption, and counsel for mother expressed concern that the prospective adoptive mother had been ambivalent about adopting the minor. After questioning the prospective adoptive mother, the juvenile court found, by clear and convincing evidence, that the minor would be adopted and terminated parental rights.

Father and mother timely appealed from the order terminating parental rights for the minor.

## DISCUSSION

1. *The Juvenile Court Properly Assumed Emergency and Continuing Jurisdiction over the Children*

Father and mother seek to set aside all orders of the juvenile court after the disposition hearing in February 1996, contending that the juvenile court lacked subject matter jurisdiction to make any findings or orders beyond those necessary to address whether an emergency actually existed in February 1996 and to ensure the minor's safety. In addition, they contend the juvenile court failed to contact the correspondent Nevada court to determine whether it wished to exercise jurisdiction.

As a reviewing court, we are not bound by the juvenile court's findings regarding subject matter jurisdiction but independently reweigh the jurisdictional facts. (*In re S.W.* (2007) 148 Cal.App.4th 1501, 1508 [56 Cal.Rptr.3d 665].)

■ The Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA; Fam. Code, § 3400 et seq.), previously the Uniform Child Custody Jurisdiction Act (UCCJA; Fam. Code, former § 3400 et seq.) (collectively, the Uniform Act), is the exclusive method of determining the proper forum for custody disputes involving other jurisdictions. The Uniform Act governs juvenile dependency proceedings as well as actions to terminate parental rights. (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1173 [108 Cal.Rptr.2d 493]; see also *In re Stephanie M.* (1994) 7 Cal.4th 295, 310 [27 Cal.Rptr.2d 595, 867 P.2d 706].)

As respondent notes, any error the court may have made in assuming jurisdiction occurred in March 1996, when the court first made jurisdictional and dispositional orders. Because the parents waited over 11 years to challenge the juvenile court's jurisdiction, the reporter's transcript of oral

proceedings dating from that time is no longer available.[3] The appellant has the burden of establishing error and, lacking an adequate record, a reviewing court will presume the evidence supports the judgment. (*Kanner v. Globe Bottling Co.* (1969) 273 Cal.App.2d 559, 564 [78 Cal.Rptr. 25].) We therefore assume the court found sufficient facts to assert jurisdiction over the children. We also assume the juvenile court found an emergency existed and the exercise of its jurisdiction was necessary to protect the children from actual or threatened mistreatment or abuse.[4] Furthermore, both parents appeared, in person and through counsel, at the jurisdictional and dispositional hearing, and after having been advised of their rights, they signed a court-ordered disposition case plan apparently without objection to the court's assumption of jurisdiction over their children.[5]

■ As the parents acknowledge, a California court can take temporary emergency jurisdiction over a child who is present in the state in order to protect the child from mistreatment or abuse. When the children were taken into custody in 1996, Family Code former section 3403, subdivision (a), provided in pertinent part that "[a] court of this state which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if . . . [¶] . . . [¶] [t]he child is physically present in this state and (A) the child has been abandoned or (B) it is necessary in an emergency to protect the child because the child has been subjected to or threatened with mistreatment or abuse or is otherwise neglected or dependent."

■ Present Family Code section 3424, subdivision (a) similarly provides that "[a] court of this state has temporary emergency jurisdiction if the child is present in this state and the child has been abandoned or it is necessary in an emergency to protect the child because the child, or a sibling . . . , is subjected to, or threatened with, mistreatment or abuse." Moreover, the Legislature has provided, in Family Code section 3424, subdivision (b), that

---

[3] The reporter's notes were destroyed pursuant to Government Code section 69955, which allows for the destruction of notes after 10 years. Accordingly, respondent advised the court no reporter's transcript is available for hearings which occurred prior to August 7, 1997.

[4] As respondent notes, although there is no dispute the parents lived in Nevada during the pendency of this proceeding, it is not clear from the existing record whether Nevada was the children's home state when they were detained. When the children were first detained, father told both the police and the social worker that his home was in Baker, California, giving a street address. Later, mother stated to respondent's social worker that the children had been detained "because she is from Baker, C[alifornia]." By the time of the detention hearing, the parents were living somewhere in the Nevada desert around Sandy Valley, which itself straddles Clark County, Nevada, and San Bernardino County, California. The record therefore does not compel the conclusion that the children's resident state was Nevada at the time they were detained, nor does it indicate the parents' residence necessarily was Nevada at that time.

[5] The record on appeal does not indicate the parents objected to the court's exercise of subject matter jurisdiction at any time prior to the appeal.

when, as here, there is no previous child custody determination that is entitled to be enforced under the UCCJEA and a child custody proceeding has not been commenced in a court of a state having jurisdiction under the UCCJEA, a child custody determination made under the section remains in effect until an order is obtained from a court of a state having jurisdiction under the UCCJEA. If a child custody proceeding has not been or is not commenced in a court of a state having jurisdiction under the UCCJEA, a child custody determination made under section 3424, subdivision (b), "becomes a final determination, if it so provides and this state becomes the home state of the child." The Legislature specifically declared its intent that the grounds on which a court may exercise temporary emergency jurisdiction be expanded and that they include those in existence under the UCCJA. (§ 3424, subd. (e).)

 We infer from this statutory scheme the Legislature's intent to afford all children found in California the protection of California's juvenile court in exigent circumstances. The children's presence in California, where they were found in the care of an inappropriate caretaker and in a filthy, hungry and neglected condition, justified the juvenile court's initial detention order. "Aside from the necessity of protecting a child from immediate harm, presence of the child in the state is the only prerequisite" to taking action. (*In re Nada R., supra*, 89 Cal.App.4th at p. 1174.)

Father and mother concede it was appropriate for the juvenile court to issue interim custody orders to protect the children pending a hearing, but they argue such circumstances confined the court to exercise only temporary jurisdiction. Citing *In re Joseph D.* (1993) 19 Cal.App.4th 678 [23 Cal.Rptr.2d 574], they argue the juvenile court should have contacted the Nevada court to discuss whether that court was interested in exercising jurisdiction before proceeding with the jurisdictional hearing and subsequent dispositional hearing. We find *Joseph D.* inapposite. In *Joseph D.*, a sister state custody order was already in existence. The appellate court held the California juvenile court improperly asserted continuing concurrent jurisdiction to determine the child's custody notwithstanding it had knowledge of the existing sister state court custody order. (*Id.* at p. 692; see *In re Stephanie M., supra*, 7 Cal.4th at p. 311, fn. 5.) In the present case, there was no competing custody order or pending sister state custody proceeding. Thus there was no potential jurisdictional conflict with another state's court as in *Joseph D.*

Other cases cited by mother are not helpful to the parents' position. *In re Aisha B.* (1988) 206 Cal.App.3d 1030, 1034 [254 Cal.Rptr. 116], held that the juvenile court under the Uniform Act was required to communicate and consult with a sister state court once the juvenile court learned the foreign court had issued an ex parte order for temporary emergency custody of the

minor. In *In re Fathom K.* (1985) 173 Cal.App.3d 773, 777 [219 Cal.Rptr. 294], the appellate court directed the juvenile court to *proceed* with dependency petitions in California in a case in which a Texas court had issued a custody order without notice to the California-based father and after the mother had relinquished her parental rights.

■ In a third case relied upon by mother, *In re Gloria F.* (1989) 212 Cal.App.3d 576, 584 [260 Cal.Rptr. 706], the appellate court declared that "[o]nce initial jurisdiction is established in a state, that state generally has continuing jurisdictional primacy, i.e., once a state with jurisdiction under the Uniform Act has made a custody order, that order may not be modified by the courts of another state. [Citations.]" The court explained that when a child is declared a ward of the court, a special custodial relationship between the child and state is created, and the trial court retains jurisdiction to act in the child's best interest even if all parties, including the child, are located out of the state. (*Id.* at p. 585.) The juvenile court may attempt a placement in another state, near the parents, but if the placement is unsuccessful it retains jurisdiction to order the child back to this state. (*Id.* at pp. 585–586.) "To suggest a court cannot issue such orders in a dependency procedure is to either impose a limitation on the variety of alternatives a court may take lest it lose its jurisdiction or suffer a loss of jurisdiction, *potentially leaving a minor without adequate supervision or resources in another state.*" (*Id.* at p. 586, italics added.) The court may decline to exercise jurisdiction at any time if it should determine California is an inconvenient forum and another state's court is a more appropriate forum. (*Ibid.*; see 10 Witkin, Summary of Cal. Law (10th ed. 2005) Parent and Child, § 175, p. 246.) Were we to find no subject matter jurisdiction this late in the proceeding, the minor and her siblings would be abandoned to the vagaries of a state that has not seen fit to assume jurisdiction and would be left without any sources of support.

■ Even though emergency jurisdiction ordinarily is intended to be short term and limited, the juvenile court may continue to exercise its authority as long as the risk of harm creating the emergency is ongoing. (*In re Nada R.*, *supra*, 89 Cal.App.4th at p. 1175 ["If the risk of harm creating the emergency is ongoing, then the court should be afforded jurisdiction to prevent such harm."].) In the present proceeding, neither father nor mother contends the conditions leading to the children being made dependents of the court would not recur should California cede jurisdiction over the children or that it is possible to return any of the children to one or both parents. They argue only that the children are subject to the jurisdiction of Nevada, a state that has expressed no interest in assuming permanent jurisdiction over the children and that appears unwilling or unable to provide the specialized services required to deal with their severe disabilities. Absent an action in Nevada for the protection of the children by the Nevada child protection agency, the California juvenile court properly had, and continues to have, jurisdiction to

act. Once the court detained the children and declared them dependents of the court, its temporary emergency jurisdiction ripened into permanent jurisdiction and California became their home state.

■ As it read in 1996, the UCCJA provided that a court competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if "[t]his state . . . is the home state of the child at the time of commencement of the proceeding . . . ." (Fam. Code, former § 3403, subd. (a)(1).) As respondent argues, the UCCJA defined "home state" as the state in which the child immediately preceding the time involved lived with the child's parents, a parent, or person acting as a parent, for at least six consecutive months. (Fam. Code, former § 3402, subd. (e), now Fam. Code, § 3402, subd. (g).) From 1996 on, the children have been in the care, custody and control of respondent. Even if the record does not affirmatively show they had been in California for six months prior to the court declaring the children to be dependents (we presume on this record they were), at least at the time the court terminated reunification services and ordered permanent planning services, the children had been in California for six months in the care of respondent and the juvenile court, who acted as a parent.

As respondent further argues, by that time jurisdiction over the children, particularly the minor, reposed in the California juvenile court since it was "in the best interest of the child that a court of this state assume jurisdiction because (A) the child and the child's parents, or the child and at least one contestant, have a significant connection with this state, and (B) there is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships." (Fam. Code, former § 3403, subd. (a)(2); see now Fam. Code, § 3421, subd. (a)(2)(A), (B); *In re Stephanie M., supra*, 7 Cal.4th at p. 310.) By that time, the children had a significant connection with this state, respondent was a contestant in the proceeding and substantial evidence had developed in this state with respect to the children's current and future care, protection, training and relationships. (See *In re Stephanie M.*, at p. 311.)

California has been and continues to be the appropriate forum as the state most directly interested in the welfare of the children. The record indicates all of the children are and were present in California and the evidence concerning the children's progress in foster care is in California. (See *In re Stephanie M., supra*, 7 Cal.4th at p. 312; *In re Nada R., supra*, 89 Cal.App.4th at p. 1175; *In re Gloria F., supra*, 212 Cal.App.3d at p. 584.) The California juvenile court, therefore, properly exercised and continues to properly exercise jurisdiction.

■ Relying on Family Code former section 3407, subdivision (d), now Family Code section 3410, subdivision (a), father argues the juvenile court failed to communicate with the Nevada court before assuming jurisdiction to determine whether the Nevada court wished to exercise jurisdiction over the children. However, that statute provides only that the juvenile court "may" communicate with a court of another state and does not mandate that the juvenile court do so.

## 2. *Respondent Concedes the Minor Is Not Adoptable*

Father and mother argue there is insufficient evidence that the minor is adoptable. In its brief, respondent has informed the court that the prospective adoptive placement for the minor fell through after the court entered its order terminating parental rights, and there is no prospect of finding a new adoptive home for the minor. Respondent accordingly states it does not object to a reversal of the juvenile court's order terminating parental rights.

■ Postjudgment evidence outside the record on appeal ordinarily may not be relied upon to reverse the judgment. (*In re Zeth S.* (2003) 31 Cal.4th 396, 405 [2 Cal.Rptr.3d 683, 73 P.3d 541].) However, in letter briefs, both counsel for father and mother state they accept the representations of respondent's counsel and concur in the reversal of the order terminating parental rights based upon such postjudgment evidence.

■ Our Supreme Court has observed that postjudgment evidence may be accepted by an appellate court in exceptional circumstances. (*In re Zeth S.,* *supra,* 31 Cal.4th at p. 405.) Referring to its earlier decision in *In re Elise K.* (1982) 33 Cal.3d 138 [187 Cal.Rptr. 483, 654 P.2d 253], the court stated that "where postjudgment evidence stands to completely undermine the legal underpinnings of the juvenile court's judgment under review, and all parties recognize as much and express a willingness to stipulate to reversal of the juvenile court's judgment, an appellate court acts within its discretion in accepting such a stipulation and reversing the judgment." (*In re Zeth S.,* at p. 414, fn. 6.) Since all parties have expressed a willingness to stipulate to reversal of the judgment terminating parental rights, we find this case to be one of the exceptional circumstances justifying reliance on postjudgment events.

We therefore reverse the judgment terminating parental rights.

## DISPOSITION

The various orders by which the juvenile court assumed jurisdiction over the minor are affirmed. The judgment of April 12, 2007, terminating parental rights as to the minor is reversed, and the cause is remanded for further proceedings consistent with this opinion.

Cooper, P. J., and Rubin, J., concurred.