Filed 10/1/14  In re Anthony B. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re ANTHONY B. et al., Persons Coming Under the Juvenile Court Law. | B250579 (Los Angeles County Super. Ct. No. CK99266) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>TAMARA B.,<br><br>    Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Elizabeth Kim, Juvenile Court Referee.  Reversed with directions.

Nicole Williams, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, William D. Thetford, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

**SUMMARY**

Tamara B. ("Mother"), the mother of now 14-year-old Anthony and 13-year-old Malik (collectively "Minors"), appeals from the juvenile court's order of June 26, 2013, declaring her sons dependents of the court under Welfare and Institutions Code[1] section 300, removing them from her custody under section 361 and ordering reunification services.

On appeal, Mother contends that the juvenile court did not have subject matter jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA or Uniform Act). (Fam. Code, §§ 3400 et seq.) Specifically, Mother argues Minnesota was Minors' "home state" within the meaning of Family Code section 3421, Minnesota did not decline to exercise jurisdiction, California was not the more appropriate forum and there was an insufficient basis to assert emergency jurisdiction or, alternatively if there was sufficient basis to assert emergency jurisdiction, the juvenile court improperly made permanent custody orders and failed to limit the duration of its jurisdiction. Mother also contends that if the juvenile court did have subject matter jurisdiction, substantial evidence did not support sustaining the petition or removing Minors from parental custody.

We reverse.

**STATEMENT OF FACTS AND PROCEDURE**

I.      **Petition**

On May 7, 2013, the Los Angeles Department of Children and Family Services ("DCFS") filed a section 300 petition ("Petition") on behalf of Minors alleging that Mother and Father, Anthony B. ("Father")[2]–who resides separately in Minnesota–had made an inappropriate plan for the Minors' ongoing care and supervision by leaving them

---

[1] Statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] Father is not a party to this appeal.

in the care of an unrelated adult male, Michael R.–a resident of Glendale, California who has a history of eight convictions of sexual acts on children including sexual penetration of a minor and sex crime against a child. The Petition alleged that this inappropriate plan placed the Minors at risk of physical harm, damage and danger under section 300, subdivisions (b) and (d).

## II. Detention Report

Also on May 7, 2013, DCFS filed a Detention Report stating that Minors were removed from Michael's care on May 2, 2013, and had been placed in foster care. The Detention Report stated that Mother and Father had signed a notarized letter allowing Michael to care for the Minors and Michael relocated Minors from Minnesota to Glendale, California in November 2012.[3] On April 23, 2013, the Glendale Police Department reported that on January 3 or 4, 2013, it had received a telephone call from a woman in St. Paul, Minnesota who stated that she was Michael's daughter and that she was concerned about the welfare of the Minors "because [Michael] was convicted of 8 counts of sexual penetration on a minor, which we verified." The police department interviewed Minors and they reported no abuse.[4] The police believed that Michael's victim in the prior convictions was his son.

According to a Glendale Police Department report attached to the Detention Report, the police returned on April 24, 2013, for a follow-up interview and requested a

---

[3] Attached to the Detention Report was a form "Appointment of Short-Term Guardian For Minor Child(ren) and Durable Healthcare Power of Attorney" designating Michael signed by Mother and Father.

[4] The Glendale Police Department report indicates that the well-being check was conducted based on the January 3, 2013 request of the Corona Police Department and, after speaking to Minors, the "incident was cleared with no evidence of crime." According to the police report, Michael's daughter called the Glendale Police Department the next day reporting that Michael "was convicted over thirty years ago of child molestation in Saint Paul, Minnesota" and she was concerned he "might be doing the same with two boys who are currently living with him." Michael's daughter stated that she had been told by the Corona Police Department that Michael might be living in Glendale.

DCFS case worker accompany them.[5] The police report also indicated that Michael was convicted in 1984 of sexual contact and/or penetration with a minor and sentenced to 109 months and served five years and nine months. The Glendale police report stated that Michael is not a court mandated registered sex offender in Minnesota because his arrest and conviction occurred prior to 1990 enactment of those statutes in Minnesota.

During his conversation with police on April 24, 2013, Michael stated that he believed Mother and Father were aware of his conviction but he had never directly talked to them about it. In his conversation with the DCFS social worker that same day, Michael stated that Mother and Father did not know he was convicted of a sex crime against a child, saying if he told them they might "just pack them up and send them back to Minnesota where they would be out in the street again."

Michael told the DCFS social worker that he had known the boys all their lives, that Mother was "doing her own thing" and "not doing a very good job caring for them," and that the Minors were basically "latch key kids." He stated that he was convicted for a sex crime against a child who was a relative and served about five years but was not a registered sex offender or on probation. Michael stated that he was a "very different person now" and he "would never hurt these boys" and does everything he can to protect them and care for them.

In their April 24, 2013 interviews with the DCFS social worker, both Minors denied any abuse or inappropriate touching by Michael, stated they were happy living with Michael and his wife, and were doing well in school. Minors stated that their Mother did not take very good care of them and made promises she did not keep. Minors also stated that they were in contact with their parents. Malik stated he was "happy here" and Anthony said that he thought Michael, who they referred to as "Dad", was "the best dad in the world."

---

[5] The police report did not indicate that anything prompted the follow-up interview. Although the report indicated that Michael's daughter contacted the Glendale Police Department a second time, that call occurred on January 22, 2013.

According to the Detention Report, the DCFS social worker spoke to Father on April 23, 2013, and stated that he knew nothing of Michael's past history that would concern him but was concerned that DCFS was calling. On April 28, 2013, the social worker informed Father of Michael's criminal conviction and Father stated that he was unaware and very concerned, and would contact Mother immediately. After being unable to reach Mother for several days, the social worker spoke to Mother on April 28, 2013 as well, and she stated she was unaware of Michael's conviction of sexual abuse against children and that her "issue for coming to California to get my sons is primarily financial, but I will do what I can to make that happen." Father informed the social worker that after speaking to Mother they had "'decided that we don't want to spook [Michael] because they are planning to come here to Minnesota in June when school is out, and we will just not send the boys back at that time. We don't have any family in California at this time to make any temporary arrangement.'" On May 2, 2013, Father stated that he was unable to find an affordable flight to California and that it was "'very difficult financially to come to various court hearings'" but he wanted to make clear that "we have not abandoned our children and we want them and care for them."

The Detention Report stated that on May 2, 2013, a detective from the Glendale Police Department informed DCFS that "'We received the police report on [Michael] from Minnesota, and [Michael] perpetrated sexual and physical abuse against his biological children. At the time his two sons were 18-years-old and 10-years-old. His daughter was 14-years-old at the time. [Michael] engaged in oral and anal sex with his two sons individually and simultaneously. It is also possible that he had his daughter watch the acts. This happened in 1984. The abuse was disclosed when the 10-year-old ran away from home. [Michael] also sexually abused other minors who were associated with the boys.'" Michael's Minnesota arrest records were attached to the Detention Report.

The Detention Report stated that "parents were not aware of [Michael's] conviction of 8 counts of sexual abuse on children, which includes his biological children. However, once parents were informed of [Michael's] history and the children's

5

vulnerability for abuse in the care of [Michael], the parents were unwilling and/or unable to immediately act or intervene to remove the children from [Michael's] care." Mother and Father's "absence or neglect" "are the reason that the children were taken into protective custody" and "are the reason that continued detention is necessary."

## III. Detention Hearing

At the May 7, 2013 detention hearing, Mother was present[6] and represented by retained counsel and Minors were present and represented by appointed counsel. Father, who was not present, was represented by appointed counsel.

At the detention hearing,[7] Mother's counsel noted that Mother had flown out from Minnesota and requested that the Minors be released to her care so she could take them back to Minnesota. Mother argued that she "was only recently notified of this issue. She indicates about last Tuesday there was an issue about [Michael] and his past and based upon that she did fly in last night. She's here today to let the court know she loves her children, and she wants to take them back home. We are asking for the court to release them." DCFS counsel requested detention based on the prima facie case and noted that the reports indicated that when notified about Michael's past, the parents "they did not do what they needed to do" and were going to "get here by summertime."[8] Father's counsel requested that Minors be released to Father's care in Minnesota, noting that he was unable to fly out for the detention hearing because of financial issues. Father's counsel also indicated that Father was hopeful that the Minors could be "returned to him or Mother in Minnesota." Minors' counsel joined Father's request that the Minors be returned to Father's care in Minnesota but did not agree to returning Minors to Mother because of the concerns described in the Detention Report with Mother. The juvenile

---

[6] The May 7, 2013 detention hearing, was the only hearing Mother attended and Father did not attend any of the hearings.

[7] On July 16, 2014, on this Court's own motion, we ordered the record on appeal augmented with the reporter's transcript from the May 7, 2013 detention hearing.

[8] Mother disputed this fact.

6

court noted that Father did not take immediate action when given the information about Michael's criminal history and noted that Father's response to not "spook" Michael and wait for the Minors to visit Minnesota in June was not "entirely appropriate," although the court stated that it could "a little bit more easily put [itself] on that point of view."[9]

The juvenile court found a prima facie case to detain the Minors, including finding under section 319 that "continuance in the home of the parents" was contrary to the children's welfare and presented a substantial danger to the physical or emotional health of Minors. The court ordered DCFS to "investigate whether Minnesota would be the more appropriate forum for this case. And in the event, there is another state willing to take jurisdiction, bring to the court's attention immediately." The juvenile court also ordered DCFS to facilitate visits for Mother while she was in Los Angeles.

## IV.   CASA

On May 13, 2013, a Court Appointed Special Advocate ("CASA") was appointed pursuant to section 356.5 to investigate the circumstances of the case. On May 28, 2013, the CASA submitted a report indicating that a CASA in Minnesota had visited Mother's home and reviewed her living situation. The CASA report stated, "[n]either this form, nor any of its contents, shall be used to evaluate a placement under the Interstate Compact on the Placement of Children ('ICPC') . . . ."

## V.   **Jurisdiction/Disposition Report**

In a May 28, 2013 Jurisdiction/Disposition Report, the DCFS investigator reported an interview with Mother in which Mother stated she had no knowledge of Michael's convictions until Minors were removed from his home, stating Michael had been around the boys since they were born, and that Minors loved being in Los Angeles and seemed really happy. Father also stated he had no knowledge of Michael's convictions and

---

[9] At the detention hearing, the court and parties also discussed when parents, and Father in particular was informed of Michael's criminal conviction history. Although not specifically discussed at that hearing, a statement of cause by the social worker attached to the Detention Report states that Father was informed of Michael's convictions on April 28, 2013, "after it was cleared that the information could be provided to them" and "the father informed mother of the matter."

7

would not have had any contact with Michael if Father had known. Father said that the DCFS social worker asked Father and Mother to "come get the kids, but I had no money. We had less than a week to get them." Father stated that Michael was the ex-boyfriend of Father's mother and was like a grandfather to Minors and that the Minors seemed to be doing well with Michael. Father also stated that Michael had told him that Michael's adult daughter was "'making up stuff about him, that she was jealous about how he treats the kids (Anthony and Malik)'" like they were his grandchildren.

Both Anthony and Malik denied any inappropriate touching by Michael. Anthony stated that when they lived with Mother they were "latch key kids" and lived in a neighborhood where they heard gunshots. Malik stated that Michael never left them alone like their Mother did and he "got lucky" when he moved to Glendale.

According to the Jurisdiction/Disposition Report, maternal aunt Charissa stated that she had heard something about Michael's past and believed Mother was aware, but did not know how much she knew. Charissa also stated that "[p]eople wondered why [Michael] was so interested in the boys all the time." In Charissa's opinion Mother "never showed much interest in her children," often going out all night or leaving the children "at home and not come back." Older brother D.B. was left in charge because he was the oldest. Relatives brought the children food and offered to take the kids.

Similarly, family friend and Anthony's godmother, Katie, believed Mother "'might have known what was going on'" with Michael, "that she had some idea about his past." Specifically, Katie stated that she believed "a family member might have told [Mother] about it a week before [Minors] left" for California. She stated that she believed both Mother and Father "knew of the rumor" about Michael and showed "poor judgment" by not acting on it. Katie also stated that she understood the parents were contacted by DCFS in April and Mother responded that she needed to save money to go to California to get Minors, but Mother "could have gotten money together to go to L.A." Katie, who was the director of a daycare program, stated that she and maternal relatives realized Mother "didn't really want the children." Anthony would call Katie and tell her there was no food in their house. Katie started taking Anthony home a lot and her

8

assistant at the daycare took Malik before the assistant moved away. Katie paid for Anthony's food and expenses while he was with her. Katie said when they were younger, the Minors were filthy and she would bathe them.

Maternal cousin L.B. stated that she "observed that [Michael] pays more attention to Anthony and Malik than [their younger sister and older brother D.B.]." L.B. had a conversation with Mother and Father and asked Father what he knew about Michael. Father responded that Michael loved the Minors and was a good guy and Mother responded that she had talked to Minors "and didn't think anything was going on." L.B. stated that it "seemed like neither one of them had any knowledge of [Michael's] past."

The Jurisdiction/Disposition Report indicated that Child Protective Services in St. Paul, Minnesota reported there were no dependency court cases in Minnesota regarding the family and that it had responded to three referrals regarding Minors. All three were from the children's school—the first from 2005 reporting tardiness and absences and incidences of Minors being hit by Mother with a belt on the legs; the second from 2006 reporting tardiness, lack of supervision, aggression and pushing by Malik, older brother D.B. being left in charge but unable to control Minors, D.B. "'stabbing Anthony,'" and scars and marks on the children; and the last from 2008 reporting difficulties due to Anthony's behavior but stating that details were "unknown."

## VI.    UCCJEA Hearing

On June 10, 2013, the juvenile court held a hearing with respect to how the court should proceed with regard to the UCCJEA. The juvenile court determined that California was not Minors' home state for purposes of subject matter jurisdiction. The juvenile court also stated that it had had a conversation with Judge Awsumb from the Minnesota court to discuss whether California or Minnesota should handle the matter. Judge Awsumb informed the juvenile court that there is a custody order previously made in Minnesota and Mother was given "full rights" over Minors. Judge Awsumb also stated that it would be "thoughtful and prudent to keep the case" in California. When the juvenile court informed Judge Awsumb that "the children are currently in an emergency placement only, and whether Minnesota would like to initiate child protective

9

proceedings, the judge stated that he believed it would be more prudent to have California handle the case. And if the [juvenile] court were to take jurisdiction over these children, and in the event that the mother would be considered for placement, that the court consider an ICPC with the State of [Minnesota],[10] so that a full and complete investigation of the mother's home can be conducted with formal supervision."[11]

The juvenile court concluded that with respect to UCCJEA, "we have a situation where the children are here. Their home state at this time will not initiate proceedings." After argument from counsel, the juvenile court found that, although California was not Minors' home state, "they have resided within California within the last six months, prior to commencement of these proceedings. The State of Minnesota has declined to exercise jurisdiction at this time because California is the more convenient forum."

## VII. Disqualification of Mother's Counsel

On June 11, 2013, the juvenile court found that Mother's retained counsel had an actual conflict of interest since he had been previously retained by Michael in October 2012 to draft the document giving Michael guardianship over Minors. The court appointed counsel to represent Mother.

## VIII. Additional Reports

On June 18, 2013, DCFS filed a Supplemental Report reviewing possible placement with maternal uncle, Kenny, in Georgia or with Anthony's godmother, Katie, in Minnesota. The report recommended that the juvenile court order DCFS to initiate a regular ICPC contract with Minnesota to investigate the home of Katie. The report stated that Minors feared being returned to Mother.

---

[10] The juvenile court initially misspoke and stated the IPAC would be with California but corrected itself later.

[11] The juvenile court also noted that Judge Awsumb informed it that there was another child subject to the initial custody determination, A.B., and that "he would recommend that a safety check be conducted to ensure that the other child is in a safe environment."

Also on June 18, 2013, DCFS filed a Last Minute Information for the Court again requesting the court order DCFS to initiate an ICPC of Katie's home in Minnesota.

## IX.     Jurisdiction and Disposition Hearing

At the jurisdiction and disposition hearing on June 25, 2013 and June 26, 2013,[12] the juvenile court found by a preponderance of the evidence the allegations of the Petition to be true.  The juvenile court noted that the parents failed to take steps to protect the children after learning of Michael's history of sexually abusing his own children and noted that DCFS asked parents to come to California to pick up the children due to the high risk of abuse, but parents' plan was to allow the boys to remain with Michael for an additional two months.  The juvenile court stated that "the parents reasonably should have known that the children were in danger of that abuse, and that once they did receive this information, they did not act in a timely manner."  The juvenile court declared Minors to be dependants of the court under section 300, subdivision (b) and (d), and found by clear and convincing evidence under section 361, subdivision (c) that there was a substantial danger if the children were returned home.

## X.     Appeal

On July 1, 2013, Mother filed a notice of appeal.[13]


### DISCUSSION

On appeal, Mother argues that the juvenile court did not have subject matter jurisdiction under Family Code section 3421.  Specifically, Mother argues that Minnesota

---

[12] At a prior jurisdiction and disposition hearing on June 11, 2013, the juvenile court disqualified Mother's privately retained counsel as having a conflict of interest from his prior representation of Michael in drafting the guardianship document.  The juvenile court appointed an attorney to represent Mother and continued the hearing to June 18, 2013.  On June 18, the court again continued the hearing because appointed counsel was unable to contact Mother.

[13] On March 21, 2014, we granted DCFS's motion for judicial notice of the February 18, 2014 minute order, placing Minors with Katie, Anthony's godmother, in Minnesota pursuant to the ICPC.

did not decline to exercise jurisdiction, contending that Judge Awsumb's statement that it would be "thoughtful and prudent" to keep the case in California were "ambiguous and not a resolute declination of jurisdiction." Additionally, Mother argues that there was no support for a conclusion that Minors and at least one parent had "significant connection" to California as mere physical presence is insufficient (Fam. Code, § 3421, subd. (a)(2)), and arguing that parents had no connection to California, relatives and witnesses did not reside in California and records pertaining to Michael's conviction were in Minnesota.

Mother also contends that the juvenile court did not have a sufficient basis to assert emergency jurisdiction under Family Code section 3424 because "the facts in this case do not rise to the level of an immediate risk of mistreatment or abuse." Mother argues that, if there was sufficient basis to assert emergency jurisdiction, the juvenile court improperly made permanent custody orders and failed to limit the duration of its jurisdiction in light of a prior custody order in Minnesota.

Finally, Mother contends that if the juvenile court did have subject matter jurisdiction, substantial evidence did not support sustaining the petition or removing Minors from her custody.[14]

We conclude the juvenile court's continuing exercise of emergency jurisdiction was in error and reverse.

## I.     The UCCJEA

The UCCJEA is the exclusive method in California to determine the proper forum in child custody proceedings involving other jurisdictions. (*In re C.T.* (2002) 100 Cal.App.4th 101, 106.) A dependency action is a "child custody proceeding" subject to the UCCJEA. (Fam. Code, § 3402, subd. (d).) The purpose of the UCCJEA, in the context of dependency proceedings, is to promote stability for children by avoiding jurisdictional conflicts, promoting cooperation with courts of other states in child custody

---

[14] DCFS contends that the juvenile court has, and continues to have, emergency subject matter jurisdiction, and that the disposition order is temporary and not a permanent order. DCFS also argues that substantial evidence supports the juvenile court's jurisdiction and disposition orders.

proceedings, litigating custody matters in fora where children and their families are most closely connected, avoiding relitigating custody decisions made in other states, and promoting the exchange of information and mutual assistance among the courts of various states. (*In re C.T.*, *supra*, 100 Cal.App.4th at p. 106.)

In determining whether subject matter jurisdiction exists, an appellate court independently reweighs the jurisdictional facts. (*In re Jaheim B.* (2008) 169 Cal.App.4th 1343, 1348.) "'Subject matter jurisdiction either exists or does not exist at the time an action is commenced. [Citation.] There is no provision in the UCCJEA for jurisdiction by reason of the presence of the parties or by stipulation, consent, waiver, or estoppel. [Citations.]'" (*Brewer v. Carter* (2013) 218 Cal.App.4th 1312, 1316-1317.)

Family Code section 3421 provides four bases under which California has jurisdiction to make an *initial* child custody determination. (Fam. Code, § 3421, subd. (a).) Family Code section 3421, subdivision (a) confers jurisdiction on the California juvenile court "only if any of the following are true:

"(1) This state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state.

"(2) A court of another state does not have jurisdiction under paragraph (1), or a court of the home state of the child has declined to exercise jurisdiction on the grounds that this state is the more appropriate forum under Section 3427 or 3428, and both of the following are true:

"(A) The child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence.

"(B) Substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships.

13

"(3) All courts having jurisdiction under paragraph (1) or (2) have declined to exercise jurisdiction on the ground that a court of this state is the more appropriate forum to determine the custody of the child under Section 3427 or 3428.

"(4) No court of any other state would have jurisdiction under the criteria specified in paragraph (1), (2), or (3)."

Here, when the juvenile court spoke to Minnesota Judge Awsumb, it was informed that Minnesota made a prior custody determination giving Mother "full rights" over Minors. Accordingly, the juvenile court's jurisdiction under the UCCJEA was governed not by Family Code section 3421 on initial child custody determination,[15] but by section 3423 governing modification of a custody determination of another state. Family Code section 3423 provides that California courts "may not modify a child custody determination made by a court of another state unless a court of this state has jurisdiction to make an initial determination under paragraph (1) or (2) of subdivision (a) of Section 3421" *and* either of two additional requirements are met.[16] (Fam. Code, § 3423.) Paragraph (1) of subdivision (a) of Family Code section 3421 refers to "home state" jurisdiction and paragraph (2) refers to jurisdiction when the home state declines to exercise jurisdiction on the grounds that California is a more appropriate forum, the child and a parent have "significant connection with California," and substantial evidence is available in California. Here, the juvenile court determined, and parties do not dispute, that California was not Minors' "home state" under Family Code section 3421,

---

[15] "Initial determination" is defined as "the first child custody determination concerning a particular child." (Fam. Code, § 3402, subd. (h).)

[16] Under Family Code section 3423, either of the following two determinations could support jurisdiction to modify a custody determination: "(a) The court of the other state determines it no longer has exclusive, continuing jurisdiction under Section 3422 or that a court of this state would be a more convenient forum under Section 3427. [¶] (b) A court of this state or a court of the other state determines that the child, the child's parents, and any person acting as a parent do not presently reside in the other state."

14

subdivision (a)(1).[17]  Likewise, neither Mother nor Father had a "significant connection" with California under Family Code section 3421, subdivision (a)(2).[18]  Thus, the juvenile court did not have jurisdiction under section 3423 of the Famliy Code.

"Section 3424 provides an exception to the exclusive jurisdictional bases for making an initial child custody determination or modifying a sister state custody order. [Citations.]" (*In re Cristian I.* (2014) 224 Cal.App.4th 1088, 1097.)  The California juvenile court may exercise temporary jurisdiction under section 3424 jurisdiction when a "child is present in this state and . . . it is necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to, or threatened with, mistreatment or abuse." (Fam. Code, § 3424, subd. (a).)  "The courts have interpreted 'emergency' as a situation in which a child is in immediate risk of danger if returned to a parent's care.  (See *In re Stephanie M.* [(1994)] 7 Cal.4th 295 [court asserted emergency jurisdiction over an abused child diagnosed as suffering from battered child syndrome]; *In re Joseph D.* (1993) 19 Cal.App.4th 678 [emergency jurisdiction was proper based on reported incidents involving sexual abuse by child's stepbrother and father].)  Aside from the necessity of protecting a child from immediate harm, presence of the child in the state is the only prerequisite.  (19 Cal.4th 678, 688.)  [¶] . . . In cases where the validity of the

---

[17] "'Home state' means the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding. . . ." (Fam. Code, § 3402, subd. (g).) Here, Minors had been living in California for just under six months when the Petition was filed.

[18] While Michael has "significant connection with this state" under subdivision (a)(2)(A), he does not fall with the definition of a "person acting as a parent" because he had physical custody of Minors for less than six months when the Petition was filed. Specifically, a "'[p]erson acting as a parent' means a person, other than a parent, who: (1) has physical custody of the child or has had physical custody for a period of six consecutive months, including any temporary absence, within one year immediately before the commencement of a child custody proceeding; and (2) has been awarded legal custody by a court or claims a right to legal custody under the law of this state." (Fam. Code, § 3402, subd. (m).)  "'Physical custody' means the physical care and supervision of a child." (Fam. Code, § 3402, subd. (n).)

15

allegations are uncertain, the very possibility the allegations of immediate harm might be true is sufficient for the court to assume emergency jurisdiction in the best interests of the children. (*In re Joseph D.*, *supra*, 19 Cal.App.4th at p. 688.)" (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1174.)

"Although emergency jurisdiction is generally intended to be short term and limited, the juvenile court may continue to exercise its authority as long as the reasons underlying the dependency exists. [Citations.]" (*In re Jaheim B.*, *supra*, 169 Cal.App.4th at pp. 1349-1350; *In re Angel L.* (2008) 159 Cal.App.4th 1127, 1139-1140 ["Even though emergency jurisdiction ordinarily is intended to be short term and limited, the juvenile court may continue to exercise its authority as long as the risk of harm creating the emergency is ongoing. [Citation.]"].) Thus, a California court has "continuing jurisdiction because of the emergency presented by the abuse of the child and the impossibility of returning her immediately to her parents." (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 312.)

Here, the juvenile court's exercise of emergency jurisdiction should have ended at the May 7, 2014 detention hearing, when Mother appeared in person and requested the return of Minors to her care. DCFS apparently informed Father of Michael's criminal history on April 28, 2013,[19] and the Minors were removed from Michael's home on May 2, 2013. Mother personally appeared at the May 7, 2013 detention hearing, and stated through counsel that she was ready to take the Minors into her care and return to Minnesota with them. Thus, the record shows that nine days after being informed of Michael's conviction, Mother came to California to ask the juvenile court to allow her to take Minors back to Minnesota. At this point, any risk of immediate harm to Minors from their placement with Michael no longer existed as they could have been returned to Mother's care. There was no contention that Mother planned to return Minors to Michael's care if they were released to her. Although Minor's counsel expressed concerns about Mother's alleged neglect and lack of interest in caring for Minors, if true

---

[19] See footnote 9, *ante*.

such harm, while deplorable, would not present a risk of immediate danger to Minors supporting the exercise of emergency jurisdiction under the UCCJEA.

Accordingly, we find that the juvenile court lacked jurisdiction to make the jurisdictional findings and disposition order. A court that lacks subject matter jurisdiction has no power to hear or determine the case and any judgment or order rendered is void on its face. (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 196.)[20]

## DISPOSITION

The jurisdictional findings and disposition order are reversed and the juvenile court is directed to vacate these findings and order.

NOT TO BE PUBLISHED.

CHANEY, Acting P. J.

We concur:

JOHNSON, J.

MILLER, J.[*]

---

[20] Based on this conclusion, we need not address appellant's remaining contentions.

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

17