Filed 3/11/15  In re D.S. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re D.S. et al.,<br><br>Persons Coming Under the Juvenile Court Law. | B255928<br><br>(Los Angeles County<br>Super. Ct. No. CK79322) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>TIMOTHY S.,<br><br>　　　Defendant and Appellant. | |

　　　APPEAL from an order of the Superior Court of Los Angeles County, Tony L. Richardson, Judge.  Affirmed in part with directions; conditionally reversed in part with directions; dismissed in part.

　　　Lori Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Richard D. Weiss, Acting County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Tyson B. Nelson, Deputy County Counsel, for Plaintiff and Respondent.

_____

## INTRODUCTION

In this appeal, Timothy S. (Father)[1] challenges the juvenile court's jurisdictional findings that he sexually abused his sons' half-sister and, as a result, placed his sons, D.S. and Dakota S., at substantial risk of sexual abuse. He also challenges the disposition order declaring his sons dependents of the juvenile court under Welfare and Institutions Code[2] section 300, subdivisions (b) (failure to protect), (d) (sexual abuse), and (j) (abuse of sibling) based on his conduct. Father also contends the trial court erred in removing his sons from his custody, restricting his visitation with his sons, and releasing them into the custody of their mother, Suzanne D. (Mother).[3]

We affirm the court's jurisdiction order. However, we remand to the juvenile court with directions to modify the first amended petition consistent with this opinion. We also conditionally reverse the disposition order and remand to the juvenile court to make findings under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA; Fam. Code, § 3400 et seq.) as to the home state of D.S. and Dakota and, if the court finds Florida is the home state, to immediately contact the Florida court to determine whether it intends to exercise jurisdiction over the children.

_____

[1] For purposes of clarity, we will refer to the parents as Mother and Father and other individuals by their first names.

[2] All statutory references are to the Welfare and Institutions Code unless otherwise noted.

[3] Suzanne D. is not a party to this appeal.

Because the custody and visitation order has been superseded by a new custody and visitation order, which is the subject of a separate appeal, we dismiss Father's appeal from the disposition order as to custody and visitation as moot.

Father's separate appeal from the juvenile court's "Custody Order-Juvenile-Final Judgment" (Final Judgment), filed on December 15, 2014 (case No. B261548), terminating jurisdiction and setting forth the terms of custody and visitation for D.S. and Dakota, is stayed pending resolution of the UCCJEA issues by the juvenile court consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Family Background*

Father and Mother had an eight-year relationship, and had two sons, D.S. (born in 2007) and Dakota (born in 2010), who are the only subjects of this appeal. Father and Mother lived together in Florida, never married and are no longer together. Father has two older sons from a different relationship. Mother has three older children from a prior relationship with Josh L., a daughter, Shelby L. (born in 1997), and two sons. Shelby and her brothers live with their father in Florida.

### B. *The Sexual Abuse Allegations*

When Mother was pregnant with D.S., she and Father lived in a motel in Florida. On one occasion in 2006 when Shelby was eight or nine years old,[4] she was visiting with Mother, who left her alone with Father. According to Mother, this is the only time she left Shelby alone with Father. Shelby told her mother that Father made her put her mouth on his penis. Mother said that Shelby told her that "he had asked her to go down and put her mouth on it." Shelby told Mother about the incident after Shelby "started flipping out

---

[4]    Mother testified that Shelby was nine or ten years old at the time of the incident. However, given Shelby's birth date in 1997, she was at most nine years old in 2006.

beyond control" while she was later in the car with Mother and Father, and Father reached back in the car "into her vicinity." Mother calmed Shelby down, and Shelby told her mother what happened.

Mother felt "outrage" but stayed with Father because she had nowhere else to go. However, Shelby continued to live with her father Josh, and Mother never left her alone with Father again.

The incident was the subject of an investigation by the police and the State of Florida Department of Children and Families (Florida DCF). A dependency petition was never filed but, according to an "Investigative Summary" by the Florida DCF,[5] at some point a notation is made: "THIS REPORT IS CLOSED WITH VERIFIED FINDINGS OF SEXUAL ABUSE AND FAILURE TO PROTECT." No criminal charges were brought against Father.

When Father was interviewed by a social worker from the Los Angeles County Department of Children and Family Services (DCFS), Father stated that "the girl tried to give me a blow job. I was investigated by [Florida] DCF and by the cops. Nothing ever happened. The girl had issues. Prior to that, she was expelled from riding the bus for sexually assaulting another kid. Nothing happened. I treated Suzanne's kids as my own. My mistake was I tried to cover for the daughter by not saying anything."

According to Mother, no other incidents of sexual abuse occurred. D.S. was born the following year, 2007, and Dakota was born in 2010.

C. *Mother Takes D.S. and Dakota to California*

Sometime in 2011, Mother entered into a relationship with Eric R. in Florida. D.S. and Dakota remained with Father, who was their sole caretaker. There was no custody arrangement between Mother and Father for D.S. and Dakota. In December

---

5     Father objected to consideration by the juvenile court in this proceeding of the Florida DCF Investigative Summary on hearsay grounds, which objection is discussed below.

2012, Mother visited D.S. and Dakota in Florida, took them from Father's home, and never returned them to Father. Father attempted to find his children for almost a year. In May 2013, Mother, Eric, D.S. and Dakota moved from Florida to California to start a new life.

**D.** *Events Leading up to Dependency Petition*

On June 25, 2013, Mother, Eric, D.S. and Dakota checked into the Stallion Inn in Long Beach. On June 27, Mother flew to Florida to attend her father's funeral, leaving D.S. and Dakota in Eric's care. According to Eric, after Mother left to go to Florida, Eric went with the children to a Walgreens store where he had the children wait outside of the restroom while he went inside to "snort meth." He admitted that he "screwed up" because he was supposed to take care of the kids. The following day he "started tripping out." The boys were scared and thought Eric was sick. Eric stated the drugs he was given "[were] not very good." Eric also told the social worker that he used methamphetamine once in 1995 and that he smoked marijuana.

On June 28, 2013, the Long Beach Fire Department responded to a call of a man complaining of abdominal pain at the Stallion Inn. Eric approached the responding paramedics and complained of abdominal pain. Eric was naked and appeared to be under the influence of PCP. He was hitting himself repeatedly and sweating profusely. Eric admitted he had smoked methamphetamine the prior day while caring for D.S. and Dakota. Paramedics transported Eric to the hospital, suspecting a possible overdose. D.S. and Dakota were detained because Mother was in Florida.

The social worker contacted Mother by telephone in Florida. Mother admitted knowing that Eric had a prior history of drug usage, but denied any knowledge that he had used drugs during their relationship. Mother stated she never would have left her children with Eric if she knew he was currently using drugs. Mother said she was scheduled to return to California on July 2, 2013 but would try to return earlier. The social worker also left a message on Father's answering machine, advising him that his sons had been detained and providing the detention hearing date and location.

5

Based on these facts, the children were taken into protective custody, and the DCFS social worker placed them with foster care providers.

### E. *The Dependency Petition and Detention Hearing*

On July 3, 2013, DCFS filed a juvenile dependency petition on behalf of D.S. and Dakota, alleging that Mother had failed to protect the children by leaving them in the care of Eric, who abused methamphetamine while the children were under his care. The petition alleged that Mother knew or should have known about Eric's substance abuse. The petition alleged that Mother's making of an inappropriate plan for the children's care and supervision and her failure to protect the children endangered their physical health and safety, placing them at risk of physical harm within the meaning of section 300, subdivision (b).

At the detention hearing on July 3, 2013, the court found a prima facie case had been established for detaining D.S. and Dakota, and that they came within section 300, subdivision (b). Mother was present at the hearing; Father was not. The court found that there was a substantial danger to the children's physical or emotional health if they were not removed from Mother's home. The court found Father to be the presumed father of D.S. and the alleged father of Dakota. The court ordered that D.S. and Dakota be detained, and ordered monitored visitation for Mother. No visitation was ordered for Father.

On July 19, 2013, DCFS filed a first amended petition, which re-alleged the count under section 300, subdivision (b), relating to Eric's use of methamphetamine and added counts alleging jurisdiction under section 300, subdivisions (b), (d) and (j) on the basis that Father had sexually abused the children's half-sibling Shelby in April and May 2006. The amended petition alleged that "[t]he father fondled the child Shelby's breasts, removed his pants, and caused the child to put his penis in her mouth."[6] The amended

_____

[6] Because Mother testified that she was not aware of Father fondling Shelby's breasts, we will not consider the allegation as support for the jurisdiction or disposition

6

petition alleged that Mother knew of Father's sexual abuse of Shelby and failed to protect Shelby, instead telling her "not to tell anyone about the abuse." The petition also alleged that Father's sexual abuse and Mother's failure to protect Shelby placed siblings D.S. and Dakota "at risk of harm, damage, danger, sexual abuse and failure to protect." The juvenile court dismissed the original dependency petition.

## F. *The Jurisdiction and Disposition Hearings*

The juvenile court first called the matter for the jurisdiction hearing on July 23, 2013. The hearing was continued several times for further investigation into the Florida sexual abuse allegations and ultimately was held on April 17 and 18, 2014.

### 1. *The Juvenile Court's Evidentiary Rulings*

The juvenile court first held a hearing on Father's written objections to DCFS's evidence. Pursuant to section 355, Father objected to (1) an email dated July 31, 2013 from Jammie Wiysel, a senior clerk from the Child Investigations Support Unit in Florida; (2) an email dated August 1, 2013 from Mark A. Roper, a northwest regional criminal justice coordinator from the Florida DCF; (3) the "Investigative Summary" pertaining to the incident of sexual abuse "in April or May of 2006" that was reported to Florida DCF on August 16, 2006; and (4) statements made by Josh, Shelby's father, which were set forth in the jurisdiction/disposition report. All of the evidence at issue pertained to the allegations that Father sexually abused Shelby.

Father argued that the two emails were hearsay and that the declarants were not available for cross-examination. DCFS argued that the two emails were admissible under section 355, subdivision (c)(1)(C), as statements made by a licensed social worker in a social study report prepared by a child welfare agency. The juvenile court overruled Father's hearsay objections to the two emails. As to the email dated July 31, 2013 from

---

orders entered in this case. As we discuss below, the alleged fondling of the breasts is only referenced in the hearsay statements made in a report from the Florida DCF.

7

Wiysel, the court found that the Child Investigations Support Unit in Florida was "akin" to DCFS, but that it wasn't clear whether Wiysel, as a "senior clerk," was a licensed social worker. The juvenile court overruled the objection, but stated: "I will, however, only give whatever statements are reflected in this e-mail, the weight of this title. I will not use the statements . . . that are reflected in this e-mail as a basis or the sole basis for assuming jurisdiction in this case."

As to the August 13, 2013 email from Roper, the juvenile court found that Roper, as the "northwest criminal justice coordinator for the Florida Department [of] Children and Families," was affiliated with an organization that is "akin" to DCFS and overruled the objection, but again stated that the court "will not receive whatever information is related in that e-mail as being the sole basis for sustaining any allegations that are being made in this matter."

With respect to the Investigative Summary, the juvenile court overruled Father's hearsay objection, noting the summary was a "social study" report within the meaning of section 355, subdivision (b)(1).[7] In light of Father's hearsay objection, however, the court further noted that "the specific hearsay evidence is not to be by itself sufficient to support any jurisdictional finding or any ultimate facts upon [which] the jurisdictional finding were based."[8] Finally, the juvenile court sustained Father's objections to Josh's statements in the jurisdiction/disposition report, and expanded its ruling to cover all

[7] "A social study prepared by the petitioning agency, and hearsay evidence contained in it, is admissible and constitutes competent evidence upon which a finding of jurisdiction pursuant to Section 300 may be based, to the extent allowed by subdivisions (c) and (d)." (§ 355, subd. (b).) The term "'social study'" is defined as any written report "furnished to the juvenile court . . . by the county probation or welfare department in any matter involving the custody, status, or welfare of a minor in a dependency proceeding . . . ." (*Id*., subd. (b)(1).)

[8] Section 355, subdivision (c)(1), provides that if there is a timely objection to admission of hearsay in the social study, the hearsay evidence "shall not be sufficient by itself to support a jurisdictional finding or any ultimate fact upon which a jurisdictional finding is based," unless one of the exceptions applies. One of the exceptions is for a licensed social worker. (§ 355, subd. (c)(1)(C).)

8

hearsay statements made by Josh. The court ordered Josh's statements stricken from the reports.

2. *Testimony at the Jurisdiction Hearing*

As noted above, Mother testified that on one occasion in 2006, when Mother and Father were in the car with Shelby, Shelby "started flipping out beyond control" when Father reached back into her vicinity. Mother said it took her "20 to 30 minutes to get [Shelby] to calm down to let me know what was wrong." At that time Shelby told her mother that Father made her put her mouth on his penis. Shelby made this disclosure sometime in 2006; Mother could not remember the month. Some days later the incident was reported to the Florida DCF, and a case was opened.

When Mother confronted Father about what Shelby had said, Father said Shelby was lying. Mother told Father that she believed Shelby because "a child doesn't just go out of the blue freaking out over a lie." Mother stayed with Father because she was pregnant with D.S. and had nowhere else to go. Mother attempted to protect Shelby by making sure she was never alone with Father when she visited. Mother denied telling Shelby not to tell anyone what Father had done.

Mother further testified that she was worried that Father might sexually abuse D.S. or Dakota, stating, "Because ordinarily, I've heard that if they can't get the ones that they like, they will go off to the other gender." She also testified that Father "likes women of all ages. . . . If they dress the part, he looks and tries to interact." She testified that this would include children under 18. She opposed releasing D.S. and Dakota to Father.

Neither D.S. nor Dakota had been born at the time Shelby was sexually abused. Following their births, Father served as their caregiver while Mother worked. When asked whether she felt that Father posed "a tremendous safety risk" to the boys, she answered, "Yes, I did, but I had no other choice but to leave them with him. I had no other child care at that moment, and I was the only one working." To Mother's knowledge, Father never abused either of their sons sexually.

9

Mother, who had married Eric, testified she received general relief and was otherwise financially dependent upon Eric, who was employed as a landscaper. They had lived in the park for two to four months but currently had stable housing at their church. She and Eric were staying in a large room, and D.S. and Dakota would be able to live with them there until they found permanent housing. Mother testified that, as a result of the dependency case, she was participating in parenting classes and undergoing alcohol and drug testing.

Jonathan Halperin, a DCFS social worker, also testified. He remembered receiving emails from Wiysel and Roper from the Florida child welfare agencies, but did not know if either was a social worker or what training or education they had in social work. Halperin did not interview Shelby because her father Josh was concerned about her psychological well-being. Halperin also felt that no further investigation was needed because the Florida agency had "verified" the allegations of sexual abuse. It was Halperin's understanding that a dependency petition was not filed in Florida because the department instead stated that Father could not have contact with Shelby and that Mother could not have contact with Father in Shelby's presence. Halperin also testified that a criminal case was never filed against Father, but he did not know why.

Father did not appear or testify at the hearing. DCFS notes in a document provided to the court that, as to Father's progress as of April 17, 2014, "CSW has advised father that it is recommended for him to participate in parenting classes, [and] individual counseling to address issues of sexual abuse. However, father refuses to participate in services as he denies the allegations and reports that he is not at fault."

### 3. *Closing Argument*

After the close of testimony, DCFS's counsel argued that the juvenile court should sustain the petition on all counts. As to the allegation regarding Mother's failure to protect the children from Eric's drug use, counsel argued that Mother knew about Eric's prior drug use and therefore reasonably should have known that Eric was using drugs when she left the children with him.

As to the allegations of sexual abuse, DCFS's counsel urged the court to consider the Investigative Summary that concluded that the allegations of sexual abuse had been "verified." She also pointed out that Mother testified as to what Shelby told her about the abuse. She also argued that Mother failed to protect Shelby from Father by continuing to live with Father, even though she testified she had nowhere else to go.

Minors' counsel[9] joined in the DCFS arguments as to Father, and added, "I'd be extremely concerned that to this day the father of the children is still denying that that occurred, and that his actions back in 2006, unless he had complied with sex offender classes or some kind of treatment that would deal with that issue, that he would still pose a risk to the children."

Mother's counsel argued that the court should not find that Mother was currently failing to protect the children with respect to the sexual abuse. She noted that Mother prevented Shelby from being alone with Father and that there was no further sexual abuse after the one incident. As to Eric's drug use, she noted that Mother left prior to Eric using drugs and that Mother did not observe any signs of Eric currently using drugs.

Father's counsel renewed his evidentiary objections and pointed out that the court had no information as to what it meant that Florida DCF had made a "verified finding." He also noted that Shelby later recanted her statements made to the police and Florida DCF, and that DCFS never interviewed Shelby.[10] He also argued the court should consider that a dependency petition was never filed in Florida nor were criminal charges brought against Father. Father's counsel also argued that Mother was not credible as to her testimony about the sexual abuse[11] and that even if the court were to find that Father

---

[9]     Minors' counsel Pamela Wright represented both D.S. and Dakota.

[10]    Because the juvenile court relied principally on the testimony of Mother, without relying on the Florida reports, we do not address Father's arguments as to the consistency of the interviews of Shelby.

[11]    Father did not raise a hearsay objection to Mother's testimony regarding Shelby's statements about the sexual abuse, but instead argued that she was not credible.

11

committed the sexual abuse, there was no evidence to show that D.S. and Dakota were at risk of sexual abuse in Father's care.

### 4. *The Juvenile Court's Ruling*

The juvenile court ruled as follows: "I do find that the Department has met its burden based on the information before me. I'll start on the back end. I disagree with Father's counsel's take on the evidence that's been presented before this court. I am not, as I've indicated before, crediting the hearsay statements that were presented or attempted to be presented out of Florida. I am, however, crediting the testimony of Mother who on the stand yesterday did provide ample details of what she understood and she accepted to be sexual-abuse activity of the Father with regard to another sibling Shelby. I do find, notwithstanding Father's counsel's comments, that Mother was credible, credible to the point of, in several instances, making statements that necessarily would not [i]nure to her benefit. But to the extent that they were factually accurate, she stated them as such. Based largely on Mother's testimony more so than anything else,[12] I do find that there is—the burden has been met with respect to the b2 and the d1 and j1 counts as they are alleged with respect to the Father and also with respect to Mother in terms of Mother failing to protect."

As to count b-1, the juvenile court noted that Mother's "antenna should have been certainly up" insofar as her decision to leave D.S. and Dakota with Eric. The court therefore found "not only that she reasonably should have known, but I do think as alleged Mother had an appreciation of the circumstances. And, again, here's an issue where it appears she failed to protect her two young sons with respect to [Eric's] abuse."

---

[12]    Based on the juvenile court's statement that it was not "crediting the hearsay statements that were presented or attempted to be presented out of Florida" and that the court based its findings "largely on Mother's testimony more so than anything else," we do not address Father's evidentiary objections, but instead consider whether based on Mother's testimony alone there was substantial evidence to support the court's jurisdictional findings.

The court found by a preponderance of the evidence that counts b-1, b-2, d-1, and j-1 of the petition were true, and that D.S. and Dakota were persons described by section 300.

5. *The Disposition Hearing*

The disposition hearing was held on the same day, April 18, 2014. At the hearing, the court declared D.S. and Dakota dependents of the court under section 300 and ordered that Mother retain physical custody of the children under the supervision of DCFS.

At the beginning of the hearing, the juvenile court provided its tentative ruling to return the children to the care of Mother with conditions, including that Mother continue to reside in the housing provided by the church, Eric only have monitored contact with the minors, and Father only have monitored visits and phone calls.

Counsel for DCFS objected to release of the children to Mother. Minors' counsel agreed with the court's tentative to place the children with Mother under DCFS supervision with Father having monitored visitation. Mother's counsel requested that DCFS have the power to increase Eric's contact with the children, which the court later rejected.

Father's counsel argued that the case was more like *In re Rubisela E.* (2000) 85 Cal.App.4th 177, than *In re I.J.* (2013) 56 Cal.4th 766 (*I.J.*),[13] because the sexual abuse alleged was not sufficiently severe to support a finding the boys were at risk of sexual abuse. He also noted that Father had sole custody over the boys prior to them moving to California, and that there was no record of Father mistreating or harming the boys in any manner. Father's counsel argued that the children should be placed with Father instead of with Mother.

---

[13]     We discuss *I.J.* below; the court in *I.J.*, *supra*, 56 Cal.4th at pages 780-781, disapproved of *In re Rubisela E.*, *supra*, 85 Cal.App.4th 177, which refused to find substantial risk of sexual abuse to a boy based on molestation of a girl absent evidence of the father's interest in male children (*id.* at pp. 197-199).

The juvenile court adopted its tentative ruling, declaring D.S. and Dakota dependents of the court under section 300. While the court ordered that Mother retain physical custody of the children under the supervision of DCFS, it ordered Mother to participate in services provided by DCFS and Eric to have only monitored contact with the children. The court found that placement of the children in the home of Father would be "contrary to the children's welfare." The court ordered DCFS to set up a schedule of monitored in person or phone visits between Father and the children.

The matter was set for a six-month review hearing on October 17, 2014. This appeal by Father followed. Father appeals the jurisdiction and disposition orders and the admission of the hearsay statements at the hearing.

6. *Termination of Jurisdiction and Entry of Final Custody Order*

On December 12, 2014, during the pendency of this appeal, the juvenile court terminated jurisdiction but stayed the order until receipt of a final custody order.[14] On December 15, 2015, the juvenile court signed the Final Judgment, and the termination of jurisdiction became effective. The custody order grants Mother physical custody of D.S. and Dakota, grants Father and Mother joint legal custody of their sons, and grants Father supervised visitation and telephone calls with his sons. As we discuss below, the filing of the custody order and termination of jurisdiction renders the appeal of the juvenile court's April 18, 2014 disposition order as to placement and visitation of the minors moot, and that portion of the appeal is dismissed.

On January 13, 2015, Father filed a timely notice of appeal of the court's termination of jurisdiction and custody order. That appeal will be addressed by a separate opinion of this court.

---

14     On our own motion, we take judicial notice of the juvenile court's file in this matter. (Evid. Code, §§ 452, subd. (d), 459; *R.S. v. Superior Court* (2009) 172 Cal.App.4th 1049, 1052, fn. 2.)

## DISCUSSION

### A. *We Reach the Merits of Father's Jurisdictional Challenge*

Father contends that substantial evidence does not support the juvenile court's jurisdictional findings under section 300, subdivisions (b), (d) and (j), as to his alleged sexual abuse of Shelby and resulting risk to D.S. and Dakota. DCFS argues that we need not consider Father's jurisdictional challenges because Mother did not appeal and jurisdiction is proper based on Mother's conduct alleged in count b-1 of the first amended petition.

"'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' [Citation.]" (*I.J.*, *supra*, 56 Cal.4th at p. 773; accord, *In re Quentin H.* (2014) 230 Cal.App.4th 608, 613; *In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)

However, as this court held in *In re Quentin H.*, *supra*, 230 Cal.App.4th at page 613, "when, as here, the outcome of the appeal could be 'the difference between father's being an "offending" parent versus a "non-offending" parent,' a finding that could result in far-reaching consequences with respect to these and future dependency proceedings, we find it appropriate to exercise our discretion to consider the appeal on the merits. [Citations.]" In *In re Quentin H.*, this court addressed jurisdiction based on the father's prior conviction for sexual abuse where the father argued he had rebutted the section 355 presumption that he posed a substantial risk of harm to his children where his conviction for a sex offense was 20 years old and he had not reoffended since then. (*Id.* at p. 610.)

Similarly, in this case, given the potential impact the jurisdictional finding based on past sexual abuse may have as to Father for future custody and visitation, we find

15

there could be "far-reaching consequences," and reach the merits of Father's challenges to the court's jurisdictional findings based on his alleged sexual abuse of Shelby.

## B. *Standard of Review*

We review the juvenile court's jurisdictional findings by applying the substantial evidence test. (*I.J.*, *supra*, 56 Cal.4th at p. 773; *In re Quentin H.*, *supra*, 230 Cal.App.4th at p. 613; *In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1216.) "'"In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.] '"[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate].""' [Citation.]" [Citation.]' [Citation.]" (*I.J.*, *supra*, 56 Cal.4th at p. 773; accord, *In re Isabella F.* (2014) 226 Cal.App.4th 128, 137-138.) It is the parent's burden on appeal to show the evidence is insufficient. (*In re Isabella F.*, *supra*, at p. 138.)

## C. *Substantial Evidence Supports the Juvenile Court's Finding That D.S. and Dakota Were at Substantial Risk of Sexual Abuse*

Father contends the evidence is insufficient to support the juvenile court's determination that he sexually abused Shelby. He argues in the alternative that, even if we find substantial evidence to support a finding of sexual abuse, Father's sexual abuse of Shelby does not support the juvenile court's exercise of jurisdiction over D.S. and Dakota under section 300, subdivisions (b), (d) and (j).

As we note above, we can affirm the juvenile court's finding of jurisdiction over D.S. and Dakota based on Father's conduct if substantial evidence supports any of the statutory bases for jurisdiction, in this case, subdivisions (b), (d) or (j) of section 300.

(*I.J.*, *supra*, 56 Cal.4th at p. 773; *In re Quentin H.*, *supra*, 230 Cal.App.4th at p. 613; *In re Alexis E.*, *supra*, 171 Cal.App.4th at p. 451.)  As in *I.J.*, because subdivision (j) of section 300 most closely describes the facts regarding D.S. and Dakota, we focus on that subdivision.  (See *I.J.*, *supra*, at pp. 773-774.)

A child falls within the jurisdiction of the juvenile court under subdivision (j) of section 300 if "[t]he child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions."  We will discuss each prong of this test in turn below.

 

      1.  *There is substantial evidence that Father sexually abused Shelby.*

The juvenile court found that Father sexually abused Shelby, "[b]ased largely on Mother's testimony more so than anything else."[15]  Mother's testimony regarding Shelby's reaction toward Father in the car and Shelby's subsequent disclosure that Father made her put his penis in her mouth provides substantial evidence to support the juvenile court's finding that Father sexually abused Shelby.  (See *I.J.*, *supra*, 56 Cal.4th at p. 773; *In re Christopher R.*, *supra*, 225 Cal.App.4th at p. 1217 [finding mother's drug use, unstable lifestyle and "cavalier" attitude toward childcare provided substantial evidence to support jurisdictional findings and disposition order as to mother].)

Father challenges Mother's credibility by pointing out her own deficiencies as a parent and inconsistencies in her testimony.  These challenges are unavailing.  "'It is the trial court's role to assess the credibility of the various witnesses, to weigh the evidence to resolve the conflicts in the evidence.  We have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that

---

[15]    Because the juvenile court did not principally rely on the evidence to which Father objected, we focus solely on Mother's testimony in determining whether substantial evidence supports the court's jurisdictional findings.

evidence.'" (*In re A.S.* (2011) 202 Cal.App.4th 237, 244; accord, *I.J.*, *supra*, 56 Cal.4th at p. 773.) Here the juvenile court, which observed Mother's demeanor as she testified, expressly found her testimony to be credible.

We next turn to the question whether substantial evidence supports the juvenile court's finding that D.S. and Dakota, who were almost eight and four years old, respectively, at the time of the jurisdiction and disposition hearings, are at substantial risk of sexual abuse by Father because of his sexual abuse of their half-sister Shelby.

2. *There is substantial evidence to support the juvenile court's finding that D.S. and Dakota are at substantial risk of sexual abuse.*

Section 300, subdivision (j), sets forth the factors the juvenile court "shall" consider, including "the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child." (§ 300, subd. (j).)

In *I.J.*, our Supreme Court considered the question of the circumstances under which sexual abuse of a child of one gender can support a finding of substantial risk of sexual abuse of a child of the opposite gender. In considering this question, the court held that "'[t]he broad language of subdivision (j) clearly indicates that the trial court is to consider the totality of the circumstances of the child and his or her sibling in determining whether the child is at substantial risk of harm, within the meaning of *any* of the subdivisions enumerated in subdivision (j).'" (*I.J.*, *supra*, 56 Cal.4th at p. 774, quoting *In re Maria R.* (2010) 185 Cal.App.4th 48, 64, which was disapproved on another ground in *I.J.*, *supra*, at pp. 780-781.)

The court held that subdivision (j), by listing these factors, "implies that the more egregious the abuse, the more appropriate for the juvenile court to assume jurisdiction over the siblings. [Citation.] 'Some risks may be substantial even if they carry a low degree of probability because the magnitude of the harm is potentially great. . . . [¶] . . .

18

[¶] . . . Conversely, a relatively high probability that a very minor harm will occur probably does not involve a "substantial" risk. Thus, in order to determine whether a risk is substantial, the court must consider both the likelihood that harm will occur and the magnitude of potential harm . . . .' [Citation.] In other words, the more severe the type of sibling abuse, the lower the required probability of the child's experiencing such abuse to conclude the child is at a substantial risk of abuse or neglect under section 300. If the sibling abuse is relatively minor, the court might reasonably find insubstantial a risk the child will be similarly abused; but as the abuse becomes more serious, it becomes more necessary to protect the child from even a relatively low probability of that abuse." (*I.J.*, *supra*, 56 Cal.4th at p. 778.)

The court in *I.J.* considered "whether a father's sexual abuse of his *daughter* supports a determination that his *sons* are juvenile court dependents when there is no evidence the father sexually abused or otherwise mistreated the boys, and they were unaware of their sister's abuse . . . ." (*I.J.*, *supra*, 56 Cal.4th at p. 770.) In *I.J.*, over the course of three years, the father repeatedly sexually abused his oldest daughter, including fondling, digital penetration of her vagina, forcible rape, and oral copulation. The father also forced his daughter to watch pornographic videos with him. (*Id.* at p. 771.) In concluding that the victim's sister and brothers were at substantial risk of sexual abuse, the court focused on the duration and nature of the sexual abuse inflicted on the oldest daughter by the father. The court held that "a father's prolonged and egregious sexual abuse of his own child may provide substantial evidence to support a finding that all his children are juvenile court dependents." (*Id*. at p. 770.)

The court clarified that "[i]n upholding the assertion of jurisdiction in this case, we are not holding that the juvenile court is compelled, as a matter of law, to assume jurisdiction over all the children whenever one child is sexually abused. We merely hold

19

the evidence in this case supports the juvenile court's assertion of jurisdiction." (*I.J.*, *supra*, 56 Cal.4th at p. 780, citing *In re Jordan R.* (2012) 205 Cal.App.4th 111.)[16]

The court in *I.J.* also considered section 355.1, subdivision (d), noting that it "provides that a prior finding of sexual abuse (of anyone, not just a sibling) is prima facie evidence that the child who is the subject of the dependency hearing is subject to the court's jurisdiction under section 300." (*I.J.*, *supra*, 56 Cal.4th at p. 779.) The court in *I.J.* noted that, as here, section 355.1 did not apply because there was no finding in a prior proceeding that the father committed sexual abuse. However, "section 355.1 is relevant because it evinces a legislative intent that sexual abuse of someone else, without more, at least *supports* a dependency finding. [Citation.]" (*Ibid*.)

In *I.J.*, the court cited with approval, *In re P.A.* (2006) 144 Cal.App.4th 1339. (*I.J.*, *supra*, 56 Cal.4th at pp. 775-776.) In *P.A.*, the juvenile court found that "father 'sexually abused [P.A.] consisting of but not limited to . . . touching . . . [P.A.'s] vagina under her clothes on top of her underwear" and that the abuse placed the children, including P.A.'s two brothers, at risk. (*In re P.A.*, *supra*, at p. 1343.) The juvenile court found that "P.A.'s brothers were at risk of harm because they were approaching the age at which father had begun to abuse P.A. and father had access to the boys because he routinely awoke during the night to cover them." (*Id*. at p. 1345, fn. omitted.) This district affirmed, holding: "we are convinced that where, as here, a child has been

---

[16]    In *In re Jordan R.*, the court affirmed the juvenile court's finding of jurisdiction over a seven-year-old daughter but not a two-year-old son where there was evidence of the father's sexual abuse of his 13-year-old niece. The sexual abuse in *Jordan R.* was substantial, including the niece orally copulating the father and the father licking and touching the niece's genitals and breasts. However, the court based its jurisdictional finding as to the daughter in part on the fact that the father wrestled with the daughter in a manner similar to how he wrestled with his niece at the age of eight, which a social worker stated "was a grooming behavior for later abuse." (*In re Jordan R.*, *supra*, 205 Cal.App.4th at pp. 119-120.) By contrast, the son was only two years old, the father had only wrestled with him a few times, and he had no inappropriate contact with him. (*Id*. at p. 138.)

sexually abused, any younger sibling who is approaching the age at which the child was abused, may be found to be at risk of sexual abuse." (*Id.* at p. 1347.)

The court in *I.J*, also cited with approval *In re Karen R.* (2001) 95 Cal.App.4th 84. (*I.J.*, *supra*, 56 Cal.4th at p. 775.) There the father forcibly raped his older daughter twice; she was approximately 12 years old at the time. In upholding the jurisdictional finding that Karen R.'s eight-year-old brother was at substantial risk of sexual abuse, this district held that "a father who has committed two incidents of forcible incestuous rape of his minor daughter reasonably can be said to be so sexually aberrant that both male and female siblings of the victim are at substantial risk of sexual abuse . . . if left in the home. . . . Although the danger of sexual abuse of a female sibling in such a situation may be greater than the danger of sexual abuse of a male sibling, the danger of sexual abuse to the male sibling is nonetheless still substantial. Given the facts of this case, the juvenile court reasonably could conclude every minor in the home, regardless of gender, was in substantial danger of sexual abuse by father." (*In re Karen R.*, *supra*, at pp. 90-91.)

Turning to the facts of this case, the sexual abuse here (oral copulation with an eight- or nine-year-old) is far more egregious than the sexual abuse in *In re P.A.* (touching vaginal area over underwear), although not as severe as the "serious and prolonged nature of father's sexual abuse of his daughter," including digital penetration and rape, in *I.J.* (*In re I.J.*, *supra*, 56 Cal.4th at p. 778) and the two rapes in *Karen R.* (*In re Karen R.*, *supra*, 95 Cal.App.4th at p. 87). Although the sexual abuse here occurred only once six years earlier, it nonetheless was "egregious." (See *I.J.*, *supra*, at p. 770.)

The sexual abuse by Father is no less egregious because Shelby was not Father's biological daughter. As long as Father was in a relationship with Mother, Shelby was for all practical purposes his stepdaughter. As the *I.J.* court observed, "'[S]exual or other serious physical abuse of a child by an adult constitutes a fundamental betrayal of the appropriate relationship between the generations. . . . When a parent abuses his or her child, . . . the parent also abandons and contravenes the parental role. . . . [Citation.]'

21

[Citation.]" (*I.J.*, *supra*, 56 Cal.4th at p. 778.) This observation is equally applicable when the victim of abuse is a stepchild, as in this case.

Of significance here is that the sons are approaching the age of Shelby at the time of the sexual abuse, which was eight or nine. In this case, at the time of the jurisdiction hearing, D.S. was eight—about the same age as Shelby—and Dakota was four. D.S.'s age of eight, and even Dakota's age of four, is significantly closer to Shelby's age than the two-year-old boy in *In re Jordan R.* where the abused niece was 13. We also note that the sexual abuse in this case, oral copulation, can be performed by both females and males.

Finally, a critical factor here is Father's denial of any sexual abuse and his refusal to follow the social worker's recommendation that he participate in parenting classes and individual counseling to address issues of sexual abuse. As long as Father fails to acknowledge and accept responsibility for his actions, his sons are at risk.

Father's argument that there is no evidence that he ever sexually abused D.S. or Dakota during the time he was their sole caregiver,[17] or that he had a sexual predisposition toward males of any age, is not persuasive. As the Supreme Court noted in *I.J.*, "section 300 does not require that a child actually be abused or neglected before the juvenile court can assume jurisdiction. The subdivisions at issue here require only a 'substantial risk' that the child will be abused or neglected. The legislatively declared purpose of these provisions 'is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children *who are at risk of that harm*.' (§ 300.2 . . . .) 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' [Citation.]" (*I.J.*, *supra*, 46 Cal.4th at p. 773.)

---

[17] Father also points to the lack of evidence of abuse by him of his two older sons. However, there is no evidence in the record as to his relationship with these sons, so we cannot give any weight to this assertion.

22

We find based on the totality of the circumstances that substantial evidence supports the juvenile court's determination that D.S. and Dakota were at risk of harm of sexual abuse within the meaning of section 300, subdivision (j). On this basis we affirm the jurisdiction and disposition orders declaring D.S. and Dakota dependents of the court under section 300, subdivision (j).[18]

3. *The first amended petition should be amended to conform to proof.*

The court made findings that all three counts under section 300, subdivisions (b), (d) and (j) were sustained. The first amended petition alleges in all three counts that the sexual abuse occurred "[i]n April and May 2006." Further, the first amended petition alleges in count b-2 that "[t]he father fondled the child Shelby's breasts, removed his pants, and caused the child to put his penis in her mouth." The same allegation is repeated in counts d-1 and j-1.

Mother only testified to one instance of sexual abuse by Father, which occurred in 2006, but she could not remember the month. Because there was only one instance of sexual abuse and uncertainty as to the precise month, the language in the first amended petition that currently reads "[i]n April and May 2006," should be modified to read, "On one occasion in 2006."

Also, Mother was not aware of whether Father fondled Shelby's breasts, and could not testify to that fact. Neither did Mother testify that Shelby told her that Father pulled down his pants. Accordingly, counts b-2, d-1 and j-1 of the first amended petition should be amended to read as to counts b-2, d-1 and j-1: "The father caused the child to put his penis in her mouth."

---

[18] While we affirm the jurisdiction order under section 300, subdivision (j), we note that the same findings that support jurisdiction under subdivision (j) also support jurisdiction under subdivisions (b) (failure to protect) and (d) (substantial risk of sexual abuse).

**D.** *The Juvenile Court Should Have Considered Whether Florida Was the Children's Home State Under the UCCJEA*

DCFS raises on appeal that the juvenile court failed to consider the UCCJEA (Fam. Code, § 3400 et seq.).[19] The impact of the UCCJEA was not raised by any party below. Father also failed to raise this issue in his opening brief, although in his reply brief he argues for the first time that this is a ground for reversal of the juvenile court's jurisdiction order. We find that it is likely that Florida was the home state of D.S. and Dakota and that the juvenile court should have considered the UCCJEA. Further, had the juvenile court found that Florida is the home state, the court should have immediately contacted Florida to determine if it intended to assert jurisdiction over the children.

1. *The Exercise of Temporary Jurisdiction Under the UCCJEA*

The UCCJEA was "adopted in California effective January 1, 2000 [citation] . . . , governs dependency proceedings and is the exclusive method for determining the proper forum to decide custody issues" involving other jurisdictions. (*In re Cristian I.* (2014) 224 Cal.App.4th 1088, 1096; accord, *In re A.M.* (2014) 224 Cal.App.4th 593, 597; *In re Jaheim B.* (2008) 169 Cal.App.4th 1343, 1348; *In re C.T.* (2002) 100 Cal.App.4th 101, 106.) Further, "[s]ubject matter jurisdiction either exists or does not exist at the time the action is commenced and cannot be conferred by stipulation, consent, waiver or estoppel." (*In re Jaheim B.*, *supra*, at p. 1348.)

"Under section 3421, California may assume jurisdiction to make an initial child custody determination only if any of the following apply: California is the child's 'home state,' . . . (§§ 3421, subd. (a)(1), 3402, subd. (g)); a court of another state does not have jurisdiction because it is not the child's home state (§ 3421, subd (a)(2)); a court of the child's home state has declined to exercise jurisdiction on the ground California is the more appropriate forum (*ibid.*); all courts having jurisdiction have declined to exercise

---

[19] Statutory references to the UCCJEA in this section are to the Family Code.

jurisdiction on the ground California is the more appropriate forum (§ 3421, subd. (a)(3)); or no other state has jurisdiction under the foregoing tests (§ 3421, subd. (a)(4))." (*In re A.M.*, *supra*, 224 Cal.App.4th at p. 598; accord, *In re Jaheim B.*, *supra*, 169 Cal.App.4th at pp. 1348-1349.) A minor's "'[h]ome state'" is defined in section 3402, subdivision (g), as "the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding."[20]

Section 3424 provides that a juvenile court may exercise "temporary emergency jurisdiction" when a "child is present in this state and . . . it is necessary in an emergency to protect the child because the child . . . is subjected to, or threatened with, mistreatment or abuse." (§ 3424, subd. (a); *In re Cristian I.*, *supra*, 224 Cal.App.4th at pp. 1096-1097.) "An 'emergency' exists when there is an immediate risk of danger to the child if he or she is returned to a parent. [Citation.]" (*In re Jaheim B.*, *supra*, 169 Cal.App.4th at p. 1349.)

As we held in *In re Cristian I.*, "'Although emergency jurisdiction is generally intended to be short term and limited, the juvenile court may continue to exercise its authority as long as the reasons underlying the dependency exist.' [Citations.]" (*In re Cristian I.*, *supra*, 224 Cal.App.4th at p. 1097.) Further, where, as here, no prior child custody determination is in effect in a state having jurisdiction under the UCCJEA, "'a child custody determination made under [section 3424] remains in effect until an order is obtained from a court of a state having jurisdiction under the UCCJEA. If a child custody proceeding has not been or is not commenced in a court of a state having

---

[20]     Both DCFS and Father contend that Florida is the minors' home state because the children were born in Florida and resided there until May 2013, less than six months before the filing of the petition on July 3, 2013. While there is evidence in the record that Mother and Eric moved with D.S. and Dakota to California in May 2013, because this issue was not addressed below and Mother is not a party to this appeal, we remand for the juvenile court to make a finding as to the home state of D.S. and Dakota. For purposes of this opinion, however, we are assuming that Florida is likely the home state.

jurisdiction under the UCCJEA, a child custody determination made under section 3424, subdivision (b), "becomes a final determination, if it so provides and this state becomes the home state of the child."'  [Citation.]"  (*In re Jaheim B.*, *supra*, 169 Cal.App.4th at p. 1350.)

In *In re Cristian I.*, we considered the effect of the failure by the juvenile court, after exercising emergency jurisdiction, to immediately communicate with the Arizona court that had previously entered a child custody order regarding the minor.  We found that it was error for the juvenile court not to immediately contact the Arizona court, but the error was harmless because the Arizona court later ceded jurisdiction to California, and it was not reasonably probable that the delay and indirect form of communication with the Arizona court had an impact on the outcome of the case.  (*In re Cristian I.*, *supra*, 224 Cal.App.4th at p. 1101.)

In this case, it is undisputed that at the time of detention of D.S. and Dakota, there was no previous child custody determination in Florida.  This case presents the question, therefore, as to the effect of the juvenile court not communicating with the Florida court to determine whether Florida intended to exercise jurisdiction over D.S. and Dakota in the absence of an existing Florida custody order.  Our colleagues in the Fourth District addressed this issue in *In re A.M.*, *supra*, 224 Cal.App.4th 593 and *In re Jaheim B.*, *supra*, 169 Cal.App.4th 1343.  In *In re A.M.*, the court held that the juvenile court erred by not contacting Mexico to determine whether Mexico intended to assert jurisdiction over the minors, where the children had lived in Mexico for at least six months before the child welfare agency filed a section 300 petition, but found the error harmless.  (*In re A.M.*, *supra*, at p. 598.)

The court in *In re A.M.* proceeded to affirm the jurisdiction and disposition orders but "remanded for the limited purpose of contacting and providing notice to Mexican authorities to determine whether Mexico wishes to assume jurisdiction and to commence proceedings to protect the children." (*In re A.M.*, *supra*, 224 Cal.App.4th at p. 599.)  The court held that if the Mexican court did not exercise jurisdiction, the jurisdiction and disposition orders would remain in effect; if a Mexican court assumed jurisdiction and

commenced proceedings, the juvenile court was ordered to void its jurisdiction and disposition orders. (*Id*. at pp. 599-600.)

In *In re Jaheim B*., the court found that the juvenile court properly exercised emergency jurisdiction over the children where there was no previous child custody determination in their home state of Florida. (*In re Jaheim B*., *supra*, 169 Cal.App.4th at pp. 1350-1351.) Further, because the Florida court was aware of the California proceedings and did not exercise jurisdiction over the minor, the juvenile court's "'temporary emergency jurisdiction ripened into permanent jurisdiction and California became [his] home state.'" (*Id*. at p. 1351; see also *In re Angel L.* (2008) 159 Cal.App.4th 1127, 1139-1140 [where Nevada expressed no interest in assuming permanent jurisdiction over minors and was unwilling or unable to provide services needed for minors' disabilities, juvenile court's "temporary emergency jurisdiction ripened into permanent jurisdiction and California became their home state"]; *In re Nada R.* (2001) 89 Cal.App.4th 1166, 1175-1176 [remanding case to juvenile court to determine whether it could continue to assert jurisdiction over minors without communicating with Saudi Arabian court where it was unclear whether juvenile court contacted Saudi Arabian court or whether the Saudi Arabian custody decree was enforceable under UCCJEA]; cf. *In re Gino C*. (2014) 224 Cal.App.4th 959, 966 [reversing juvenile court's jurisdiction order for failure to contact home state of Mexico, finding that juvenile court erred in assuming permanent jurisdiction over minor].)

We next turn to the facts here.

2. *The Juvenile Court Erred by Not Considering Whether Florida Was the Children's Home State Under the UCCJEA*

We find that the juvenile court properly exercised emergency jurisdiction over D.S. and Dakota in light of the emergency circumstances in July 2013, including that Mother left the children in California in the care of Mother's boyfriend Eric while Eric was under the influence of methamphetamine, and the prior sexual abuse by Father of the children's stepsister Shelby. (See *In re Cristian I*., *supra*, 224 Cal.App.4th at p. 1099

[juvenile court had emergency jurisdiction where child was victim of "horrendous, three-day beating" and his removal from parents was necessary for his protection]; *In re Jaheim B.*, *supra*, 169 Cal.App.4th at pp. 1346, 1351 [juvenile court properly exercised emergency jurisdiction over two-year-old where mother left him unsupervised 100 yards from a relative's home and drove away].)

However, we find that the juvenile court erred by not addressing the jurisdictional issues under the UCCJEA and, assuming Florida was the home state of the minors, failed to immediately contact the Florida court to determine whether it intended to exercise jurisdiction over the minors. While none of the parties raised this issue, the juvenile court should have addressed the UCCJEA before entering its jurisdiction and disposition orders, and subsequently terminating jurisdiction.

We therefore conditionally reverse the disposition order,[21] with directions to the juvenile court to make a finding under the UCCJEA as to whether California or Florida is the home state of D.S. and Dakota and, if it determines that Florida is the home state, to immediately contact the Florida court to determine whether it intends to exercise jurisdiction over the children. Pending resolution of the UCCJEA issues raised in this opinion, Father's appeal in case No. B261548 is stayed.

If the Florida court declines to exercise jurisdiction over D.S. and Dakota, then the juvenile court's jurisdiction and disposition orders will become final, and Father's appeal of the order terminating jurisdiction will be reinstated. If the Florida court exercises jurisdiction over D.S. and Dakota, then the juvenile court is directed to vacate its jurisdiction and disposition orders, and Father's appeal of the order terminating jurisdiction will be dismissed. Until the juvenile court makes a final determination of the UCCJEA issues addressed herein, the final custody order entered by the juvenile court as

---

[21] As discussed above, we affirm the juvenile court's jurisdiction order. However, we are treating the jurisdiction order as an emergency order until the juvenile court addresses the jurisdictional issues under the UCCJEA, as set forth in this opinion.

28

part of the Final Judgment on December 15, 2014 shall remain in effect, with the juvenile court having continuing jurisdiction to modify the order as appropriate.

### E. *The Challenges to the Custody and Visitation Portions of the Disposition Order Are Moot*

When subsequent events have rendered an appeal moot because no effective relief can be granted, the appeal must be dismissed. (*In re A.B.* (2014) 225 Cal.App.4th 1358, 1364 [finding appeal of jurisdictional finding in petition rendered moot by subsequent petition based on new and independent facts]; *In re Jessica K.* (2000) 79 Cal.App.4th 1313, 1315-1316 [dismissing appeal from denial of section 388 petition to return child to mother's custody as moot after dependency court terminated mother's parental rights and mother failed to appeal from that order].)

While we conditionally reverse the juvenile court's April 18, 2014 disposition order with instructions for the juvenile court to address the UCCJEA, in any event, Father's appeal of the custody and placement portions of the disposition order are moot because these orders have been superseded during the pendency of this appeal. As noted above, on December 15, 2014, the juvenile court terminated jurisdiction and entered a custody order as to D.S. and Dakota. Father has appealed from these orders, and the appeal will be addressed by a separate opinion of this court.

Because we cannot grant Father any effective relief from the juvenile court's placement and visitation orders made at the disposition hearing, his appeal, insofar as it pertains to these orders, is moot. (*In re A.B.*, *supra*, 225 Cal.App.4th at p. 1364.)

### DISPOSITION

The matter is remanded to the juvenile court with directions to modify the jurisdictional findings set forth in counts b-2, d-1 and j-1 of the first amended petition (1) by deleting the introductory phrase "In April and May 2006" and inserting in its place the phrase "On one occasion in 2006"; and (2) striking the words "fondled the child

29

Shelby's breasts" and "removed his pants" from the second sentence of counts b-2, d-1 and j-1 of the first amended petition, so the sentence in each reads: "The father caused the child to put his penis in her mouth." As modified, the jurisdiction order is affirmed.

We conditionally reverse the disposition order adjudging D.S. and Dakota dependent children of the court with directions to the juvenile court to address the UCCJEA issue and to conduct further proceedings consistent with the opinion of this court.

Father's appeal from the disposition order as to custody and visitation is dismissed as moot. Father's separate appeal in case No. B261548 is stayed pending resolution of the UCCJEA issues by the juvenile court consistent with this opinion.

FEUER, J.*

We concur:

PERLUSS, P. J.

ZELON, J.

---

*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.